UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Gaoee T., | Case No. 22-CV-1992 (JFD) |
| Plaintiff, | |
| v. | AMENDED ORDER[1] |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Gaoee T. seeks judicial review of a final decision by the Defendant Commissioner of Social Security denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The matter is now before the Court on Plaintiff's Brief (Dkt. No. 11) and Defendant's Motion for Summary Judgment (Dkt. No. 14).

Plaintiff seeks reversal of the final decision of the Acting Commissioner of the Social Security Administration ("SSA") on the following grounds: (1) the Administrative Law Judge ("ALJ") did not fully and fairly develop the record concerning Plaintiff's cognition and memory; (2) the ALJ failed to account for a limitation opined by a medical source whom the ALJ deemed persuasive; and (3) the ALJ was not constitutionally appointed. Defendant opposes Plaintiff's motion and asks the Court to affirm the final

---

[1] The only amendment to the Court's Order issued today at Dkt. No. 19 is a change to the docket number of Defendant's Motion for Summary Judgment from Dkt. No. 17 to Dkt. No. 14.

decision. For the reasons set forth below, the Court concludes that the ALJ did not fully and fairly develop the record concerning Plaintiff's cognition and memory. Therefore, the Court reverses the final decision of the Commissioner and remands the matter to the SSA for further proceedings consistent with that conclusion. The Court also concludes that the ALJ was constitutionally appointed and that the ALJ did not err in her treatment of the opined limitation.

**I.     Background**

On October 29, 2019, Plaintiff applied for DIB and SSI asserting that she became disabled on November 15, 2015. (*See* Soc. Sec. Admin. R. (hereinafter "R.") 23, 312.)[2] Plaintiff's alleged impairments included migraines, digestive system problems, heart problems, diabetes, memory loss, depression, loss of focus, low self-esteem with loss of energy and motivation, shoulder and body pain, and an anxiety disorder with sleep problems, nightmares, and mood swings. (R. 345.)

**A.     Relevant Medical Evidence**[3]

On April 7, 2015, Plaintiff attended a therapy appointment with Breck Salisbury, MSW, LICSW. (R. 470.) Plaintiff's complaints included daily migraines and short-term memory problems. (*Id.*) She reported problems remembering meetings, what her husband

---

[2] The Social Security administrative record is filed at Dkt. No. 9. The record is consecutively paginated, and the Court cites to that pagination rather than docket number and page.

[3] The Court limits the facts in this section to those relevant to the specific issues presented for judicial review.

2

told her, and her daughter's name. (*Id.*) Mr. Salisbury diagnosed Plaintiff with major depressive disorder, recurrent, moderate. (R. 473.) Plaintiff asked Mr. Salisbury to write a letter to her employer requesting additional FMLA leave, but Mr. Salisbury suggested she ask her primary care provider, Dr. Endea Curry, because Dr. Curry had filled out the original FMLA paperwork. (R. 473.)

On April 23, 2015, Plaintiff saw Darrel Cotch, PA-C, for a psychiatric medication management appointment. (R. 483.) Plaintiff reported difficulty sleeping, worsening depression, decreased energy, decreased appetite, poor self-worth, and difficulties with focus, concentration, and memory. (*Id.*) Mr. Cotch diagnosed Plaintiff with major depressive order and possible anxiety order. (R. 485.) Plaintiff did not mention cognition or memory problems at a neurology appointment in May 2015 with Dr. Vivian Fink. (R. 486–89.)

On July 16, 2015, Plaintiff attended a psychiatric appointment with Dr. Karen Ta. (R. 491.) Plaintiff reported trouble concentrating, difficulty sleeping, fatigue, dizziness, and neck and arm numbness. (R. 492–93.) She said she had stopped working because she could not concentrate. (R. 493.) She reported that her concentration and memory were poor. (R. 494.) A recent medication change to Bupropion resulted in no side effects, more energy, fewer nightmares, better concentration, and less anxiety. (R. 493.) Dr. Ta's diagnosis was major depression, single episode, moderate. (R. 494.)

On December 17, 2015, Plaintiff saw Dr. Curry for a primary care visit. (R. 512). Dr. Curry noted significant life changes since Plaintiff's last visit, including being "let go from her job" and a separation from her husband. (R. 513.) Plaintiff reported feeling

3

depressed, but with the medication Topamax the frequency of her migraines had decreased to approximately once every two weeks. (R. 513.) By the next month, Plaintiff's migraine headaches had decreased in frequency further, to once a month, with each migraine lasting about two hours. (R. 518.)

Plaintiff attended a psychiatric appointment with Dr. Ta in February 2016. (R. 523.) Plaintiff reported feeling sad, having low self-esteem and nightmares, not sleeping well, having trouble concentrating "sometimes," and having memory problems when she was nervous. (R. 525.) When Plaintiff saw Dr. Ta the following month, Plaintiff reported feelings of anger and sadness with crying spells and low motivation, but also improved sleep, energy, concentration, and anxiety. (R. 534–35.)

On December 17, 2019, Plaintiff saw Oreoluwa Oye, APRN, CNP, on a referral from Dr. Curry, for a psychiatric evaluation. (R. 693.) Plaintiff's chief complaints were depression, nightmares, body pains, tiredness, and forgetfulness. (*Id.*) She also described cognitive dulling, which Ms. Oye noted could be a side effect of Topamax. (R. 694.) The mental status examination revealed good attention and concentration, and intact recent and remote memory. (R. 698.)

On February 19, 2020, Plaintiff reported worsening nightmares, anxiety, and stress to Ms. Oye. (R. 817.) Ms. Oye noted "talk to neurology about concerns about Topamax and cognition." (*Id.*) According to Ms. Oye, Plaintiff's mood symptoms included "concentration impairment," but Ms. Oye also noted that Plaintiff's attention and concentration were good and that her recent memory and remote memory were intact. (R. 818–19.)

4

Plaintiff had a telephone visit with Ms. Oye on April 1, 2020. (R. 830.) Plaintiff reported some improvement; she was sleeping better; and her nightmares had decreased. (*Id.*) At a July 1, 2020 appointment, Ms. Oye noted that Plaintiff's anxiety was poorly controlled and her memory was getting worse. (R. 840.) Ms. Oye wrote "Memory impairment" and "worsening memory—encouraged to discuss with her neurologist. Topamax is on her medication list, may be contributing to symptoms." (*Id.*)

On July 29, 2020, Plaintiff saw Dr. Curry for a primary care appointment and described memory problems potentially caused by medication. (R. 851–52.) Dr. Curry observed on examination "insight and memory impaired." (R. 854.) Dr. Curry agreed that Plaintiff should follow-up with her neurologist about her memory concerns. (*Id.*)

On August 3, 2020, Plaintiff saw her neurologist, Dr. Priyanka Sabharwal. (R. 868.) Dr. Sabharwal's diagnoses were migraine, cervicalgia, major depressive disorder, vitamin D deficiency, benign essential tremor, and anxiety (R. 868.) Dr. Sabharwal listed Topamax as a "prior treatment" that had caused memory concerns (R. 870), but another notation on the progress note indicated that Plaintiff was "[n]ot sure if she is taking Topamax" (R. 869). Plaintiff was in fact still taking Topamax at that time. (*See* R. 894.)

Dr. Craig Barron, Psy.D., conducted a consultative psychological evaluation of Plaintiff on October 2, 2020, at the request of the SSA. (R. 34, 1077.) Dr. Barron administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") to assess Plaintiff's overall cognitive abilities and the and the Wechsler Memory Scale-IV ("WMS-IV") to assess Plaintiff's learning and memory. (R. 1078.) On the WAIS-IV, Plaintiff scored within the mild intellectual disability range. (*Id.*) Dr. Barron remarked that Plaintiff may not have

understood the instructions because English was her second language and also "may not have been working up to her fullest capabilities." (*Id.*) On the WMS-IV, Plaintiff scored within the significantly impaired range, including multiple scores of "one," which Dr. Barron wrote was "a bit odd unless there is a possibility that she suffered a cerebral vascular accident that she is unaware of." (*Id.*) Despite the test scores, Dr. Barron said he was "very hesitant to make a diagnosis of Neurocognitive Disorder in light of the fact that none of her medical records would support that the client has significant problems with cognition and memory." (*Id.*) His diagnostic impressions were Generalized Anxiety Disorder, Unspecified Depressive Disorder, and "Rule-out Malingering versus Unspecified Neurocognitive Disorder." (R. 1082.)

During the mental status examination, Dr. Barron found that "Plaintiff presented as being confused," but he "could not tell if this was for effect or not." (R. 1079.) Plaintiff could recall the names of the current and former U.S. presidents and recall four digits forward and three digits backwards. (R. 1080.) Plaintiff said, however, that she forgot conversations and things like why she had walked into a room. (*Id.*) Dr. Barron found Plaintiff's memory and cognition test results inconsistent with her background as a college graduate who worked for 15 years as a bilingual social worker for Ramsey County. (*Id.*) He questioned whether she was "purposely malingering or perhaps has suffered some type of neurological insult that is unknown to her." (R. 1081.)

The only medical record provided to Dr. Barron by the SSA was Ms. Oye's psychiatric evaluation dated December 19, 2019. (R. 1079.) Dr. Barron summarized the

information in that record and noted that "[n]o other records were available for review." (*Id.*) In the "Recommendations" section of the report, Dr. Barron wrote,

> It would have been helpful if this examiner had more records from her primary physician as opposed to her psychiatric nurse to determine if her presentation today is consistent across settings. Due to the differences between the client's presentation during today's examination and the records that this examiner had from her psychiatric nurse, as well as her history of working as a social worker and obtaining a college degree without any evidence of having a cerebral vascular accident, exposure to neurotoxins, or having had a traumatic brain injury, this examiner believes that the client may not have been working up to her fullest capabilities.

(R. 1082.) Dr. Barron concluded that Plaintiff had the cognitive capabilities to communicate, comprehend, and retain simple directions at an unskilled competitive level, but that if other records "support her claim of significant cognitive and memory impairment," any decisions about her employability should be reassessed. (R. 1082–83.)

On August 18, 2021, Plaintiff saw Amy Larson, APRN, for headaches. Ms. Larson's treatment note also reflected nausea, vomiting, jaw pain, weakness, dizziness, photophobia, phonophobia, neck pain, back pain, paresthesias, chest pain, shortness of breath, anxiety, depression, memory concerns, and sleep issues. (*Id.*) Ms. Larson noted that Plaintiff was alert and oriented, and could recall three words immediately and two out of three words after several minutes, but could not spell "world" backward. (R. 10.)

### B. Procedural History

Plaintiff's applications for DIB and SSI were denied at the initial review and reconsideration stages. (R. 23.) An SSA ALJ held a hearing on May 12, 2021, at Plaintiff's request. (R. 49.) Plaintiff testified that she quit her previous job as a social worker because of several impairments including migraine headaches, stress, diabetes, depression, anxiety,

7

and stomachaches. (R. 57–58.) Plaintiff reported that she still got headaches four to five times a week and experienced nausea and lack of concentration as a result of her migraine medication, Topamax. (R. 58.) Plaintiff also reported confusion when cooking a meal and memory issues such as forgetting to turn off the stove or sink. (R. 60.)

Kenneth Ogren, a vocational expert, also testified during the hearing. (R. 72.) Mr. Ogren opined that a hypothetical individual with Plaintiff's characteristics and limitations, as described by the ALJ, could not perform Plaintiff's past relevant work. (R. 72–73.) Such an individual could, however, perform other jobs including laundry worker, kitchen helper, and scrap sorter, according to Mr. Ogren. (R. 73.)

The ALJ issued a decision on July 22, 2021, determining that Plaintiff was not disabled. (R. 20.) The ALJ followed the five-step sequential analysis outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). In the first step of the analysis, the ALJ determined Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of November 15, 2015. (R. 25.) At step two, the ALJ found that Plaintiff had the severe impairments of degenerative changes of the cervical spine and migraine headaches since November 15, 2015. (R. 26.) The ALJ also found that Plaintiff had the severe impairments of depressive disorder and generalized anxiety disorder since December 1, 2019. (*Id.*) The ALJ found that Plaintiff did not have a medically determinable cognitive disorder. (R. 27.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1. (R. 30.) Before moving to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") as able

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, no work at unprotected heights and no exposure to dangerous moving machinery in addition to routine repetitive not complex types of tasks and instructions, and the tasks are fixed and predictable from day to day as well as no fast pace high production goal or quota type tasks, such as on an assembly line, moving conveyor belt or would require constant handling, fingering or reaching as defined in the Dictionary of Occupational Titles.

(R. 34–35.) With this RFC, the ALJ determined, Plaintiff could not perform her past relevant work. (R. 41.) At step five, the ALJ determined that Plaintiff could work as a laundry worker, kitchen helper, or scrap sorter. (R. 42.) Therefore, Plaintiff was found not disabled. (*Id.*)

The Appeals Council denied Plaintiff's request for review on June 9, 2022. (R. 1.) This made the ALJ's decision the final decision of the Commissioner for the purpose of judicial review in accordance with section 205(g) of 42 U.S.C. § 405(g).

## II.    Legal Standards

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id*. (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse

9

the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. (*Id.*) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

It is a claimant's burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB and SSI, the claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

### III. Discussion

#### A. The ALJ Did Not Provide Dr. Barron with All Necessary Background Information, and Thereby Failed to Fully and Fairly Develop the Record Concerning Plaintiff's Cognition and Memory

Plaintiff contends that the ALJ did not fully and fairly develop the record concerning her memory and cognitive limitations. (Pl.'s Mem. at 2, 21, Dkt. No. 11.) Plaintiff points out that Dr. Barron received and reviewed only one treatment note as part of his psychological evaluation of her—Ms. Oye's psychiatric evaluation dated December 19, 2019. (*Id.* at 22.) Plaintiff emphasizes Dr. Barron's comments that "[i]t would have been helpful if this examiner had more records from her primary physician as opposed to her

10

psychiatric nurse to determine if her presentation is consistent across settings" and "if such records do surface that support her claim of significant cognitive and memory impairment," the Disability Determination Services ("DDS") office[4] "should reassess any decision they make regarding her employability." (*Id.* at 24.)

An ALJ must "order medical examinations and tests," such as a psychological evaluation, "if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *See McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). None of Plaintiff's providers submitted a medical opinion or a functional capacity assessment about her memory and cognition abilities, which the Court surmises is why the ALJ ordered the consultative evaluation from Dr. Barron.

When an ALJ orders a consultative examination, the SSA must "give the examiner any necessary background information about [the claimant's] condition." 20 C.F.R. §§ 404.1517, 416.917. Courts have interpreted the phrase "necessary background information" to varying degrees. One view is that the Commissioner "should always provide all medical records to any physician from whom [she] solicits an opinion regarding any social security case." *Mateer v. Bowen*, 702 F. Supp. 220, 222 (S.D. Iowa 1988). On the other hand, "there simply is no per se rule that an examining physician must be provided with, review, and consider the claimant's medical records to render an opinion of any value." *Jones v. Colvin*, No. C 14-3049-MWB, 2016 WL 915236, at *4 (N.D. Iowa Mar.

---

[4] "Most Social Security disability claims are initially processed through a network of local Social Security Administration (SSA) field offices and State agencies (usually called Disability Determination Services or DDSs)." SSA, https://www.ssa.gov/disability/determination.htm (last visited Sept. 8, 2023).

7, 2016); *see Pocklington v. Berryhill*, No. 2:16-CV-62 JMB, 2017 WL 3333926, at *5 (E.D. Mo. Aug. 4, 2017) (agreeing that no legal authority mandates the provision of the entire medical record to the consultative examiner and further noting that the plaintiff herself could have given additional medical records to the examiner); *Hey v. Colvin*, 136 F. Supp. 3d 1021, 1046 (D. Minn. 2015) (finding that the ALJ fulfilled his duty to fully and fairly develop the record because the consultative evaluation complied with the relevant regulations[5] and the withheld records were about diagnoses, not functioning).

Dr. Barron wrote in his report that "[i]t would have been helpful to have more records from Plaintiff's primary physician" and that records demonstrating "significant cognitive and memory impairment" would have been material to his opinion. In other

---

[5] These regulations describe the required content of a consultative examiner's report.

> The reported results of your medical history, examination, requested laboratory findings, discussions and conclusions must conform to accepted professional standards and practices in the medical field for a complete and competent examination. The facts in a particular case and the information and findings already reported in the medical and other evidence of record will dictate the extent of detail needed in the consultative examination report for that case. Thus, the detail and format for reporting the results of a purchased examination will vary depending upon the type of examination or testing requested. The reporting of information will differ from one type of examination to another when the requested examination relates to the performance of tests such as ventilatory function tests, treadmill exercise tests, or audiological tests. The medical report must be complete enough to help us determine the nature, severity, and duration of the impairment, and residual functional capacity. The report should reflect your statement of your symptoms, not simply the medical source's statements or conclusions. The medical source's report of the consultative examination should include the objective medical facts as well as observations and opinions.

20 C.F.R. §§ 404.1519n(b), 416.919n(b).

words, Dr. Barron was missing necessary background information. And indeed, some of the records which Dr. Barron said he would have liked to have had were present in Plaintiff's medical history. Plaintiff described memory, concentration, and cognitive problems to her providers several times. Her providers thought the problems could be a side effect of Topamax, which Plaintiff was still taking as late as the date of the administrative hearing. Dr. Curry observed during an examination and recorded on a treatment note "memory impaired." Both Ms. Oye and Dr. Curry urged Plaintiff to follow-up with her neurologist. When Plaintiff next saw her neurologist, Dr. Sabharwal noted that Topamax had caused memory concerns. Dr. Sabharwal described Topamax as a "prior treatment," but Plaintiff was still taking Topamax at that time.

The Court concludes that the ALJ erred by not providing necessary background information about Plaintiff's memory and cognitive issues to Dr. Barron, as required by 20 C.F.R. §§ 404.1517 and 416.917. Dr. Barron wrote that it would have been helpful to have more records from Plaintiff's primary physician, and those records were available but not provided. He also wrote that if records existed that supported Plaintiff's claim of significant cognitive and memory impairment, Plaintiff's employability should be reassessed. It is not for the Court to determine in the first instance whether the withheld records would have been helpful to Dr. Barron or would support Plaintiff's claim. Therefore, the Court will remand the matter to the SSA for a consultative examination, with instructions to give to the examiner all necessary background information about Plaintiff's memory and cognitive issues.

To the extent the Commissioner argues that any error was harmless, the Court disagrees. The ALJ relied on Dr. Barron's opinion in determining the mental elements of Plaintiff's RFC. (R. 40.) The ALJ also deemed Dr. Barron's opinion persuasive under 20 C.F.R. §§ 404.1520c and 416.920c. (R. 40–41.) Finally, Dr. Barron's opinion heavily influenced the revised reconsideration of the state agency psychological consultants (*see* R. 163, 171, 173, 193, 201), whose opinions the ALJ deemed "most persuasive" (R. 40).

### B.  The ALJ Included All Limitations in the RFC

State agency consultant Dr. Jeffrey Boyd opined that Plaintiff could "carry out routine, repetitive and 3–4 step tasks with adequate persistence and pace" but "would be markedly limited for *detailed* or complex/technical tasks" and that Plaintiff could "handle the stresses of a routine repetitive or a 3–4 step work setting" but could not handle "the stresses of a *detailed* or complex work setting." (R. 178) (emphases added). The ALJ found Dr. Boyd's opined mental limitations "most persuasive" but did not include the word "detailed" in the RFC. In relevant part, the RFC limited Plaintiff to "routine repetitive not complex types of tasks and instructions, and the tasks are fixed and predictable from day to day as well as no fast pace high production goal or quota type tasks, such as on an assembly line." (R. 35.) Plaintiff contends that the ALJ's failure to include the word "detailed" in the RFC violated *Gann v. Berryhill*, 864 F.3d 947 (8th Cir. 2017). (Pl.'s Mem. at 27.)

In *Gann*, the plaintiff's doctors opined that the plaintiff's ability to adapt to a work environment was "highly marginal," that the plaintiff was moderately limited in her ability to respond to changes in the workplace, and that the plaintiff could not do work requiring

14

an intense or frequent change in routine. *Id.* at 952–53. The ALJ found the doctors "credible" and gave "significant weight" to their opinions,[6] but the RFC did not include the limitations opined by the doctors. *Id.* As a result, the vocational expert's testimony given in response to the hypothetical question based on the RFC was not substantial evidence. *Id.* at 953 ("Because the hypothetical posed to the VE did not contain all of Gann's limitations and impairments, the VE's testimony cannot be viewed as substantial evidence that Gann is able to perform other work in the national economy.").

The limitations omitted by the ALJ in *Gann* (a highly marginal ability to adapt to a work environment, a moderately limited ability to respond to changes in the workplace, and an inability to do work requiring an intense or frequent change in routine) were far more comprehensive than the single word "detailed." The Court therefore finds *Gann* distinguishable; the omission of the word "detailed" from Plaintiff's RFC was not comparable to the error in *Gann*. Moreover, other language in the RFC covered the same functional ground as the word "detailed." Specifically, the ALJ determined that Plaintiff could perform routine, repetitive, or non-complex tasks and instructions, as long as the tasks were fixed, predictable, and not fast-paced or high-production goal-or-quota-type tasks. These limitations adequately ruled out "detailed" tasks or a "detailed" work setting.

Plaintiff argues that the jobs the ALJ found that she could do (laundry worker, kitchen helper, and scrap sorter) would require her to "[a]pply commonsense understanding

---

[6] For claims filed before March 27, 2017, when an ALJ found a medical professional "credible" or their opinion entitled to "significant weight" under 20 C.F.R. §§ 404.1527 or 416.927, the RFC had to reflect the limitations described in the opinion. *See Gann*, 864 F.3d at 952–53.

to carry out *detailed* but uninvolved written or oral instructions." *See* DICOT 318.687-010 (Kitchen Helper); DICOT 361.684-014 (Laundry Worker I); DICOT 929.687-022 (Laborer, Salvage) (emphasis added). The adjective "detailed" modifies the word "instructions," however, not the words "tasks" or "work setting," which were the words used by Dr. Boyd. Furthermore, Dr. Boyd made specific findings about Plaintiff's abilities to carry out instructions. He found that Plaintiff's "ability to carry out very short and simple instructions" was "not significantly limited"; and that her "ability to carry out detailed instructions" was only "moderately limited." (R. 176–77.) The ALJ's RFC was consistent with these findings, and the ALJ did not err by omitting the word "detailed" from the description of tasks or the work setting in the RFC.

      C.    **Whether the ALJ was Constitutionally Appointed**

Plaintiff contends that the ALJ who issued the decision in her case was not constitutionally appointed by then-Acting SSA Commissioner Nancy Berryhill. (Pl.'s Mem. at 29.) In 2016, President Barack Obama issued a Memorandum Providing an Order of Succession Within the Social Security Administration ("Succession Memorandum"). 81 Fed. Reg. 96,337 (Dec. 23, 2016); *see Dahle v. Kijakazi*, 62 F.4th 424, 426 (8th Cir. 2023). Citing the Federal Vacancies Reform Act of 1998 ("FVRA"), President Obama designated the Deputy Commissioner of Operations ("DCO") to take over as the Acting Commissioner of the Social Security Administration ("SSA") in the event that both the Commissioner and Deputy Commissioner positions became vacant. Succession Memorandum, 81 Fed. Reg. 96,337.

In January 2017, Deputy Commissioner Carolyn Colvin, who was then Acting Commissioner of the SSA, resigned. *See Dahle*, 62 F.4th at 426. There was no Commissioner in place at that time. *Id*. at 426–27. Nancy Berryhill, the DCO, therefore took over as Acting Commissioner in accordance with the Succession Memorandum. *Id*. at 427. On March 6, 2018—over 400 days after Ms. Colvin's resignation—the General Counsel of the Government Accountability Office, a non-partisan agency tasked with assuring that the executive branch is operating in compliance with the law, notified President Donald Trump that Ms. Berryhill's term as Acting Commissioner of the SSA had expired on November 17, 2017. U.S. Gov't Accountability Off., B-329853, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988–Commissioner, Social Security Administration (2018), https://www.gao.gov/products/b-329853 (last visited Aug. 23, 2023). In response, Ms. Berryhill then stepped down as Acting Commissioner and returned to her previous position as DCO, while also performing the "delegable functions"[7] of the Commissioner's office. *See Richard J. M. v. Kijakazi*, No. 19-CV-827 (KMM), 2022 WL 959914, at *4 (D. Minn. Mar. 30, 2022). President Trump nominated Andrew Saul to be the SSA Commissioner on April 17, 2018. Mr. Saul had a lengthy confirmation process and did not take office as Commissioner until June 17, 2019. *See Brent Z. v. Kijakazi*, No. 22-CV-511 (JWB/JFD), 2023 WL 1110449, at *13 (D. Minn.

---

[7] Under the Social Security Act as it was then written, "[t]he Commissioner may assign duties, and delegate, or authorize successive redelegations of, authority to act and to render decisions to such officers and employees of the [Social Security] Administration as the Commissioner may find necessary." 42 U.S.C. § 902(a)(7) (2018).

17

Jan. 30, 2023), *R. & R. adopted*, 2023 WL 2414594 (D. Minn. Mar. 8, 2023). While Mr. Saul's nomination was pending, Ms. Berryhill resumed the role of Acting Commissioner. *See id.*

Shortly after Mr. Saul's nomination reached the Senate, the Supreme Court issued its decision in *Lucia v. S.E.C.*, holding that the S.E.C.'s ALJs were "inferior officers" under the Appointments Clause, U.S. Const., Art. II, § 2, cl. 2, and therefore had to be appointed by the "President, a court of law, or a head of department." 138 S. Ct. 2044, 2049, 2051 (2018). Because the ALJs whose appointments were at issue in *Lucia* were hired by staff at the S.E.C. and not by the Chair of the S.E.C., the Supreme Court remanded the case to a properly appointed ALJ, "or the Commission itself." 138 S. Ct. at 2055. The SSA, which also used staff to hire its ALJs, was concerned that the new decision would apply to the SSA as well. SSR 19-1p, 84 Fed. Reg. 9582, 9583, 2019 WL 1324866 (Mar. 15, 2019). Thus, Acting Commissioner Berryhill responded to the *Lucia* decision on July 16, 2019, by ratifying the appointments of the SSA's ALJs. *Id.* ("To address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice, on July 16, 2018 the Acting Commissioner of Social Security ratified the appointments of [the Agency's] ALJs and approved those appointments as her own.").

One of the appointments Acting Commissioner Berryhill ratified was that of the ALJ who issued the written decision denying Plaintiff's applications for benefits. Plaintiff argues that the ALJ was not constitutionally appointed because Ms. Berryhill was not

18

properly serving as Acting Commissioner at the time she ratified the ALJ's appointment. (Pl.'s Mem. at 39.)

When Plaintiff filed her supporting memorandum on January 17, 2023, the Eighth Circuit had not yet issued its decision in *Dahle*. Plaintiff acknowledged that the *Dahle* decision would resolve whether Ms. Berryhill was properly serving as the Acting Commissioner when she ratified the appointment of the ALJ. (Pl.'s Mem. at 29.) The Eighth Circuit decided *Dahle* on March 7, 2023, finding that "Berryhill was properly serving as Acting Commissioner when she ratified the appointment of the SSA ALJs." 62 F.4th at 426. Plaintiff's challenge to the constitutionality of the ALJ's appointment is, accordingly, without merit.

## IV. Conclusion

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Dkt. No. 14) is **DENIED**; and
2. The Commissioner's decision is **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date: September 11, 2023

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge